<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
YVES RAYMOND ALEXIS,           :
                               :
            Plaintiff,         :    Civil No. 05-1484 (WJM)
                               :
     v.                        :
                               :         O P I N I O N
U.S. DEPARTMENT OF HOMELAND    :
SECURITY, et al.,              :
                               :
            Defendants.        :
_____ :
```

**APPEARANCES:**

> YVES RAYMOND ALEXIS, Plaintiff, <u>pro se</u>
> No. D34959
> Bergen County Jail
> 160 South River Street
> Hackensack, New Jersey 07601

**MARTINI**, District Judge

Plaintiff, Yves Raymond Alexis ("Alexis"), confined at the Bergen County Jail in Hackensack, New Jersey, at the time this action was submitted for filing, seeks to bring this action <u>in forma pauperis</u> pursuant to 28 U.S.C. § 1915.[1]  Based on plaintiff's affidavit of indigence, the Court grants the application to proceed <u>in forma pauperis</u> and directs the Clerk of the Court to file the Complaint without pre-payment of the filing fee.

---

[1]  Plaintiff submitted his Complaint for filing on or about March 16, 2005 with an application to proceed <u>in forma pauperis</u>.

Having reviewed the Complaint, to identify cognizable claims pursuant to 28 U.S.C. § 1915(e)(2), the Court concludes that the Complaint should proceed in part.

## I. BACKGROUND

Alexis is an immigration detainee presently confined at the Bergen County Jail.  He brings this civil rights action against the following defendants: the United States Department of Homeland Security ("DHS"); the Bureau of Immigration and Customs Enforcement ("BICE"); Edward J. McElroy, BICE District Director; Greg Kendrick, BICE Field Office Director; John P. Carbone, BICE Field Office Director; Jerry Speziale, Passaic County Sheriff; and Charles Meyer, Warden of the Passaic County Jail. (Complaint, Caption, ¶¶ 4-10).  The following factual allegations are taken from the Complaint and are accepted as true for purposes of this review.

On May 31, 2004, Alexis was detained by BICE agents and placed in the Passaic County Jail ("PCJ").  BICE had a contract with the Sheriffs of Passaic and Bergen Counties to house immigration detainees at their county jails.  DHS and BICE define these county jails as "Contract Detention Facilities" ("CDF"). (Compl., ¶¶ 14-15).  The DHS had a "Detention Operations Manual" ("Manual"), which set forth the standards for detention of immigration detainees.  The Manual allegedly provides that detainees are to be paid one dollar per day while detained.

2

Alexis submits that the Passaic Jail Handbook he received upon admission to Passaic County Jail ("PCJ") conflicts with the DHS Manual. (Compl., ¶¶ 16-19).

Upon admission to PCJ, Alexis was issued a green uniform, a pair of Chinese sandals, and a small bag of hygiene products. He was not given any t-shirts, underwear, socks, pillow, shampoo, or skin lotion, as required by the Manual. Alexis further complains that the conditions of confinement violate his constitutional rights. Thirty-five detainees are housed on the third floor of PCJ in a dormitory consisting of three-tier bunk beds jammed together. There is limited space to walk back and forth, and new detainees often have to sleep on the floor until a bed becomes available. The detainees are fed in the dormitory, which has only two tables. Many detainees have to eat on their beds. Moreover, the two tables are placed next to the urinals, toilets, and other unsanitary conditions. (Compl., ¶¶ 20-28). The detainees in the dormitory are given watered bleach to clean their toilets. They do not have sufficient cleaning agents to mop their floors, and adequately disinfect the toilets and urinal. The dormitory lacks proper ventilation, and is infested with roaches and vermin. (Compl., ¶¶ 36-40).

Alexis also complains that he is not provided a low sodium diet. He does not allege that he has a medical condition requiring a special diet. He also alleges that he does not

receive dental care.  Plaintiff further states that the detainees are subjected to illegal searches of their cells and dormitory with attack dogs.  Alexis alleges that the detainees are threatened with physical harm, verbal abuse and humiliation during these searches.  (Compl., ¶¶ 29-33).

As a result of these conditions, as alleged by plaintiff, the detainees often become stressed and fights are commonplace. (Compl., ¶ 43).  Alexis also complains that the law library at Passaic County Jail was inadequate.  It does not have the books and materials required by the Manual.  The library has only five computers for legal research, but certain forms, statutes and tort procedure were accessible only by passwords that were not available to the detainees.  (Compl., ¶¶ 44, 45).

Alexis contends that while he was detained at Passaic County Jail, from May 31, 2004 to January 4, 2005, the jail administrators did not adhere to the Manual.  He also complains that he did not receive the one dollar a day stipend as required by the Manual.  (Compl., ¶¶ 46, 47).

Plaintiff alleges that during the second week of August 2004, PCJ officers conducted a search in plaintiff's dormitory. The detainees were told to go into the hallway and stand with their hands on the wall.  During the search, all the mattresses and personal possessions of the detainees were thrown about the dormitory.  Alexis contends that his food and personal items,

which he had purchased from the commissary, were ruined.  The
detainees had to search for their belongings, which had been
scattered on the floor.  Many detainees became angry and some
personal items got lost and/or destroyed.  Alexis claims that he
lost his toothpaste, deodorant, soap, and hairbrush.  When he
complained to a corrections officer, the officer yelled for the
detainees to give back plaintiff's belongings or the officers
would tear the place up again.  The detainees were told to leave
the dormitory and the officers conducted another disruptive
search.  When the detainees were allowed to go back to their
dormitory, Alexis was told to pack up his belongings.  (Compl.,
¶¶ 48-59).

     One officer complained that Alexis was packing his things
too slowly and dragged plaintiff out of the dormitory.  The
officer then pushed Alexis in front of a second dormitory and
after another officer opened the dormitory door, Alexis was
pushed inside and onto the floor.  Alexis complains that he was
scared and humiliated from the abuse and that he was unable to
sleep that night and became depressed.  Plaintiff filed a
grievance that went unanswered.  He also went to see the jail
physician, who referred Alexis to a psychiatrist.  (Compl., ¶¶
61-66).

     Several weeks after Alexis was moved to dormitory #2, the
officers conducted a search of the dormitory.  One officer had a

5

stun gun which he pointed at every detainee as they left the
dormitory.  Another officer held back a barking attack dog.
Alexis complains that he was very afraid.  He also alleges that
his belongings were scattered on the floor during the search.  He
filed a grievance with the jail's ombudsman and with the daytime
captain, but nothing happened.  Because of these incidents,
Alexis alleges that he started to suffer from high blood
pressure, chronic bleeding from the nose, and severe headaches.
He was treated for his medical conditions at Bergen County Jail,
where he was transferred on January 4, 2005.  (Compl., ¶¶ 67-72).

Alexis alleges that his conditions of confinement and the
illegal searches deprived him of his right to due process and
equal protection as guaranteed by the Fourth, Fifth, and
Fourteenth Amendments.  He seeks both punitive and compensatory
damages in excess of $700,000.00.  (Compl., Counts One through
Four, and "Prayer for Relief").

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

The Court is required to identify cognizable claims and to
sua sponte dismiss any claim that is frivolous, malicious, fails
to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such relief,
where the plaintiff is proceeding in forma pauperis.  28 U.S.C. §
1915(e)(2)(B).

In determining the sufficiency of a <u>pro</u> <u>se</u> complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972); <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). The Court need not, however, credit a <u>pro</u> <u>se</u> plaintiff's "bald assertions" or "legal conclusions." <u>Id.</u>

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. <u>Deutsch v. United States</u>, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A <u>pro</u> <u>se</u> complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Haines</u>, 404 U.S. at 521 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)); <u>Milhouse v. Carlson</u>, 652 F.2d 371, 373 (3d Cir. 1981).

Where a complaint can be remedied by an amendment, a district court may not dismiss the complaint with prejudice, but

7

must permit the amendment.  <u>Denton v. Hernandez</u>, 504 U.S. 25, 34
(1992); <u>Alston v. Parker</u>, 363 F.3d 229 (3d Cir. 2004)(complaint
that satisfied notice pleading requirement that it contain short,
plain statement of the claim, but lacked sufficient detail to
function as a guide to discovery, was not required to be
dismissed for failure to state a claim; district court should
permit a curative amendment before dismissing a complaint, unless
an amendment would be futile or inequitable); <u>Grayson v. Mayview
State Hospital</u>, 293 F.3d 103, 108 (3d Cir. 2002) (dismissal
pursuant to 28 U.S.C. § 1915(e)(2)); <u>Shane v. Fauver</u>, 213 F.3d
113, 116-17 (3d Cir. 2000) (dismissal pursuant to 42 U.S.C.
§ 1997e(c)(1)); <u>Urrutia v. Harrisburg County Police Dept.</u>, 91
F.3d 451, 453 (3d Cir. 1996).

### III.   <u>SECTION 1983 and BIVENS LIABILITY</u>

Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983
alleging violations of his constitutional rights under the Fifth
and Fourteenth Amendments.  Section 1983 provides in relevant
part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

Here, plaintiff's civil rights claims against the state officials, Sheriff Jerry Speziale and Warden Charles Meyer, would fall under § 1983.  However, plaintiff's claims against the federal defendants: the DHS, the BICE, and the BICE officials, District Director McElroy, and Field Office Directors Kendrick and Carbone, are not cognizable under § 1983.  The claims against these federal defendants would be governed under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 389 (1971).

In Bivens, the Supreme Court held that one is entitled to recover monetary damages for injuries suffered as a result of federal officials' violations of the Fourth Amendment.  In doing so, the Supreme Court created a new tort as it applied to federal officers, and a federal counterpart to the remedy created by 42 U.S.C. § 1983.[2]  The Supreme Court has also implied Bivens

---

[2]  Bivens actions are analogous to suits under § 1983 against state officials who violate federal constitutional or statutory rights.  The two bodies of law are not "precisely

damages remedies directly under the Eighth Amendment, <u>see</u> <u>Carlson v. Green</u>, 446 U.S. 14 (1980), and the Fifth Amendment, <u>see</u> <u>Davis v. Passman</u>, 442 U.S. 228 (1979).  But "the absence of statutory relief for a constitutional violation does not necessarily mean that courts should create a damages remedy against the officer responsible for the violation."  <u>Schreiber v. Mastrogiovanni</u>, 214 F.3d 148, 152 (3d Cir. 2000) (citing <u>Schweiker v. Chilicky</u>, 487 U.S. 412 (1988)).

In order to state a claim under <u>Bivens</u>, a claimant must show (1) a deprivation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation of the right was caused by an official acting under color of federal law.  <u>See</u> <u>Mahoney v. Nat'l Org. For Women</u>, 681 F. Supp. 129, 132 (D. Conn. 1987)(citing <u>Flagg Brothers, Inc. v. Brooks</u>, 436 U.S. 149, 155-56 (1978)).

The United States has sovereign immunity except where it consents to be sued.  <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983).  In the absence of such a waiver of immunity, plaintiff cannot proceed in an action for damages against the United States or an agency of the federal government for alleged deprivation of a constitutional right, <u>see</u> <u>FDIC v. Meyer</u>, 510

_____

parallel;" however, there is a "general trend" to incorporate § 1983 law into <u>Bivens</u> suits.  <u>Egervary v. Rooney</u>, 80 F. Supp. 2d 491 (E.D.Pa. 2000)(<i>citing</i> <u>Chin v. Bowen</u>, 833 F.2d 21, 24 (2d Cir. 1987)).

U.S. 471, 484-87 (1994), or against any of the individual defendants in their official capacities, see Kentucky v. Graham, 473 U.S. 159, 166 (1985) (a suit against a government officer in his or her official capacity is a suit against the government). Plaintiff cites no authority, and the Court has located no such authority, to suggest that the United States has waived its sovereign immunity with respect to the sort of claim for damages that plaintiff seeks to assert against the DHS and the BICE. Therefore, plaintiff's Bivens' claims against these defendants in their official capacities must be dismissed.

## IV. SUPERVISOR LIABILITY

Local government units and supervisors typically are not liable under § 1983 solely on a theory of respondeat superior. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985); Monell v. Dep't of Soc. Servs. Of City of New York, 436 U.S. 658, 690-91 (1978)(municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of). "A defendant in a civil rights action must have personal involvement in the alleged wrongs, liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v.

11

Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).  Accord Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-96 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

A § 1983 action brought against a person in his or her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."  Monell, 436 U.S. at 690 n.55.  "[I]n an official-capacity action, ... a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation; thus, in an official capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."  Kentucky v. Graham, 473 U.S. 159, 166 (1985) (internal quotation marks and citations omitted).

With respect to plaintiff's claims against the federal supervisory officials at BICE, neither the Supreme Court nor the Third Circuit has addressed whether supervisors in Bivens actions may be held liable on a theory of respondeat superior.  Most courts to address the issue, however, have held that liability may not be based on respondeat superior.  See, e.g., Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)(collecting cases); Laswell v. Brown, 683 F.2d 261, 268 & n.11 (8th Cir. 1982), cert. denied, 459 U.S. 1210 (1983) (basing its conclusion on the fact that the Supreme Court has looked to § 1983 cases in evaluating

12

the nature of defendant officials' qualified immunity); <u>Kite v. Kelly</u>, 546 F.2d 334, 337-38 (10th Cir. 1976).  This Court finds persuasive the reasoning of those courts that have declined to impose <u>respondeat</u> <u>superior</u> liability in <u>Bivens</u> actions.

Here, however, plaintiff asserts the personal involvement, knowledge and acquiescence of the supervisory officials, namely, the BICE officials, Sheriff Speziale, and Warden Meyer, either through allegations of actual participation and personal direction, or of actual knowledge and acquiescence of a policy, plan or procedure.  <u>See Rode</u>, 845 F.2d at 1207.  Thus, his claims against these defendants are not predicated solely on the basis of supervisor liability.  Accordingly, the Court will examine the various allegations asserted by plaintiff to determine if he states cognizable claims to withstand summary dismissal.

### IV.  <u>ANALYSIS</u>

Plaintiff alleges the following claims: (1) denial of dental care; (2) excessive force; (3) denial of access to the courts; (4) unconstitutional conditions of confinement; (5) unlawful searches; (6) denial of equal protection; and (7) failure to train and supervise.

A.  <u>Denial of Dental Care Claim</u>

Plaintiff is an immigration detainee now and at the time of the alleged incidents.  As a person detained for deportation, plaintiff's status is equivalent to a pretrial detainee, whose

13

constitutional claims are considered under the due process clause
(under the Fifth and/or Fourteenth Amendments) instead of the
Eighth Amendment.  See Hubbard v. Taylor, 399 F.3d 150, 158 (3d
Cir. 2005); See also Edwards v. Johnson, 209 F.3d 772, 778 (5th
Cir. 2000)(citing Bell v. Wolfish, 441 U.S. 520, 535 n.16
(1979)); Despaigne v. Crolew, 89 F. Supp.2d 582, 585 (E.D.Pa.
2000).

In City of Revere v. Massachusetts General Hospital, 463
U.S. 239 (1983), the Supreme Court held that, for pretrial
detainees, the Due Process Clause of the Fourteenth Amendment,
rather than the Eighth Amendment, controls the issue of whether
prison officials must provide medical care to those confined in
jail awaiting trial.  463 U.S. at 243-45.  See also Fuentes v.
Wagner, 206 F.3d 335, 341 n.9 (3d Cir.), cert. denied, 531 U.S.
821 (2000); Monmouth County Correctional Institutional Inmates v.
Lanzaro, 834 F.2d 326, 346 n.31 (3d Cir. 1987), cert. denied, 486
U.S. 1006 (1988).  However, the Third Circuit has held that the
"deliberate indifference" standard employed in Eighth Amendment
cases also applies to pretrial detainees under the Fourteenth
Amendment.  See Simmons v. City of Philadelphia, 947 F.2d 1042,
1067 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992); Brown v.
Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990); Taylor
v. Plousis, 101 F. Supp.2d 255, 262 n.3 (D.N.J. 2000).

14

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976).  In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must satisfy an objective component and a subjective component.  He must allege:  (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  <u>Id.</u> at 106.

When pleading an Eighth Amendment claim for denial of medical care, it is crucial for a prisoner to show that his medical need was serious.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992).  <u>See also</u> <u>Boring v. Kozakiewicz</u>, 833 F.2d 468, 473 (3d Cir. 1987)(due process clause does not require that pretrial detainees receive hospital care for minor injuries), <u>cert</u>. <u>denied</u>, 485 U.S. 991 (1988).  A medical need is serious where it has been diagnosed by a physician as requiring treatment, is "so obvious that a lay person would recognize necessity for doctor's attention," or "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss."  <u>Lanzaro</u>, 834 F.2d at 347.  When evaluating the first or

15

objective element under <u>Estelle</u>, whether a plaintiff's medical need is serious, "a court should consider such factors as the severity of the medical problems, the potential for harm if the medical care is denied or delayed and whether any such harm actually resulted from the lack of medical attention." <u>Maldonado v. Terhune</u>, 28 F. Supp.2d 284, 289 (D.N.J. 1998).

Here, plaintiff alleges that he did not receive any dental care during the seven months he was detained at PCJ, but he does not allege any serious dental need that necessitated treatment. On these facts, plaintiff does not establish a serious medical need that required medical attention in the short time frame he was confined at PCJ, a necessary precondition to triggering the defendants' obligation to provide plaintiff with care.

Therefore, the Court need not reach the second element of "deliberate indifference" if no serious medical need is alleged. This claim will be dismissed without prejudice.[3]

B.   <u>Excessive Force Claim</u>

Plaintiff next alleges that he was dragged and pushed by a PCJ corrections officer when he was transferred to dormitory #2 without justification or cause.  Excessive force cases fall into

---

[3] To the extent that plaintiff can allege facts to show a serious dental or medical need for dental care during the seven months he was confined at PCJ, the Court will allow plaintiff to amend his complaint, subject to Fed.R.Civ.P. 15.  <u>See</u> <u>Denton v. Hernandez</u>, 504 U.S. 25, 34 (1992); <u>Alston v. Parker</u>, 363 F.3d 229 (3d Cir. 2004).

three categories:  (1) those involving the use of force to effectuate an arrest; (2) those against a person in police custody and/or pretrial detention; and (3) those involving the use of force against a convicted person.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The Fourth Amendment standard is applied to those cases specifically directed to the method of arrest and seizure.  Custody and detention cases are subject to the Fourteenth Amendment substantive due process analysis; and cases involving the use of force against convicted individuals are examined under the Eighth Amendment's proscription against cruel and unusual punishment.  Id. at 392-394.  As an immigration detainee at the time of the incident, plaintiff's excessive force claim is examined under the Fourteenth Amendment's substantive due process standard.

"A detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  However, there exists a minimum degree of "punishment" which must be exceeded before a constitutional violation may be found; "de minimis" punishment does not offend the Constitution.  Id. at 539 n. 21.

In Bell v. Wolfish, the Supreme Court set forth the standard to be applied in analyzing whether a detainee has been deprived of liberty without due process:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the

17

protection against deprivation of liberty without due
process of law, we think that the proper inquiry is whether
those conditions amount to punishment of the detainee.  For
under the Due Process Clause, a detainee may not be punished
prior to an adjudication of guilt in accordance with due
process of law. ...

Not every disability imposed during pretrial detention
amounts to "punishment" in the constitutional sense,
however.  Once the government has exercised its conceded
authority to detain a person pending trial, it obviously is
entitled to employ devices that are calculated to effectuate
this detention. ...

A court must decide whether the disability is imposed
for the purpose of punishment or whether it is but an
incident of some other legitimate governmental purpose.
Absent a showing of an expressed intent to punish on
the part of detention facility officials, that
determination generally will turn on "whether an
alternative purpose to which [the restriction] may
rationally be connected is assignable for it, and
whether it appears excessive in relation to the
alternative purpose assigned [to it]."  Thus, if a
particular condition or restriction of pretrial
detention is reasonably related to a legitimate
governmental objective, it does not, without more,
amount to "punishment."  Conversely, if a restriction
or condition is not reasonably related to a legitimate
goal--if it is arbitrary or purposeless--a court
permissibly may infer that the purpose of the
governmental action is punishment that may not
constitutionally be inflicted upon detainees qua
detainees.  ...

Bell, 441 U.S. at 535-39 (citations omitted); see also Fuentes,

206 F.3d at 341-42.  The Supreme Court further explained that the

government has legitimate interests that stem from its need to

maintain security and order at the detention facility.

"Restraints that are reasonably related to the institution's

interest in maintaining jail security do not, without more,

constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." <u>Id</u>. at 540.  Retribution and deterrence, however, are not legitimate nonpunitive governmental objectives.  <u>Id</u>. at 539 n.20.  Nor are grossly exaggerated responses to genuine security considerations. <u>Id.</u> at 539 n.20, 561-62.

Under this standard, plaintiff appears to have adequately alleged that the PCJ officer used excessive force against him in violation of his constitutional rights under the due process clause of the Fourteenth Amendment.  The allegations plainly infer that defendant's action in assaulting plaintiff in the manner alleged was meant to "punish" him without provocation. Plaintiff contends that he did nothing to warrant the assault and was not resisting or defying the correctional officers when the defendant "dragged" and "pushed" him.  Under these circumstances, if true, plaintiff may be able to demonstrate that the defendant's assault in or about August 2004 was a grossly exaggerated response.

However, plaintiff alleges no injury, or even a *de minimis* injury.  He states that he lost one night's sleep and was humiliated.[4]  Therefore, the Court will dismiss this claim of

---

[4]  The Court notes that plaintiff refers to nosebleeds, high blood pressure, and severe headaches in another part of his Complaint and does not allege that these symptoms occurred as a

excessive force, without prejudice, in the event plaintiff is
able to amend his complaint to allege facts concerning bodily
injury sustained from the incident.

C.   Access to Courts Claim

     Plaintiff also claims that he has been denied access to the
courts because defendants have failed to provide an adequate law
library with relevant legal materials or an access code or
password to obtain statutes and forms from the computer.

     Courts have recognized different constitutional sources for
the right of access to the courts.  Principally, the right of
access derives from the First Amendment's right to petition and
the due process clauses of the Fifth and Fourteenth Amendments.[5]

_____

result of, or are related to the excessive force incident.
However, to the extent that these symptoms are related to any
injury sustained by plaintiff as a result of being dragged and
pushed in August 2004, then the Court will allow plaintiff to
amend his Complaint accordingly.

     [5]  The right of access to the courts is an aspect of the
First Amendment right to petition.  McDonald v. Smith, 472 U.S.
479, 482 (1985); Bill Johnson's Restaurants, Inc. v. NLRB, 461
U.S. 731, 741 (1983); Milhouse v. Carlson, 652 F.2d 371, 373 (3d
Cir. 1981).  The Supreme Court also found that "[t]he
constitutional guarantee of due process of law has as a corollary
the requirement that prisoners be afforded access to the courts
in order to challenge unlawful convictions and to seek redress
for violations of their constitutional rights."  Procunier v.
Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds,
Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989).  See also,
Hudson v. Palmer, 468 U.S. 517, 523 (1984)("prisoners have the
constitutional right to petition the Government for redress of
their grievances, which includes a reasonable right of access to
the courts"); Bounds v. Smith, 430 U.S. 817 (1977); Wolff v.
McDonnell, 418 U.S. 539, 576 (1974).  The right of access to the
courts might also arise under the Sixth Amendment's right to

The right of access to the courts requires that "adequate, effective, and meaningful" access must be provided inmates who wish to challenge their criminal charge, conviction, or conditions of confinement.  Bounds v. Smith, 430 U.S. 817, 822 (1977).  In other words, prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts."  Id. at 825. "'[T]he touchstone ... is meaningful access to the courts.'" Peterkin v. Jeffes, 855 F.2d 1021, 1037 (3d Cir. 1988)(*quoting* Bounds, 430 U.S. at 823)(internal quotation omitted).

In Bounds, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and

---

counsel; however, under the circumstances of the present case, the Sixth Amendment clearly is not implicated.

incarceration." <u>Lewis v. Casey</u>, 518 U.S. 343, 355 (1996)
(emphasis in original).  Similarly, a pretrial detainee has a
right of access to the courts with respect to legal assistance
and participation in one's own defense against pending criminal
charges.  <u>See</u>, <u>e.g.</u>, <u>May v. Sheahan</u>, 226 F.3d 876, 883-84 (7th
Cir. 2000); <u>Caldwell v. Hall</u>, 2000 WL 343229 (E.D. Pa. March 31,
2000).  <u>But see</u> <u>United States v. Byrd</u>, 208 F.3d 592, 593 (7th
Cir. 2000) (pretrial detainee who rejects an offer of court-
appointed counsel in satisfaction of the Sixth Amendment right to
counsel has no alternative right to access to a law library);
<u>Wilson v. Blankenship</u>, 163 F.3d 1284, 1290-91 (11th Cir. 1998)
(same); <u>United States v. Walker</u>, 129 F.3d 1266, 1997 WL 720385,
**4 (6th Cir. 1997) (same).

     Moreover, a prisoner alleging a violation of his right of
access must show that prison officials caused him past or
imminent "actual injury" by hindering his efforts to pursue such
a claim or defense.  <u>See Lewis</u>, 518 U.S. at 348-51, 354-55
(1996); <u>Oliver v. Fauver</u>, 118 F.3d 175, 177-78 (3d Cir. 1997).
"He might show, for example, that a complaint he prepared was
dismissed for failure to satisfy some technical requirement
which, because of deficiencies in the prison's legal assistance
facilities, he could not have known.  Or that he had suffered
arguably actionable harm that he wished to bring before the
courts, but was so stymied by inadequacies of the law library

that he was unable to file even a complaint." <u>Lewis</u>, 518 U.S. at 351.

In describing the scope of services which must be provided by the state to indigent prisoners, the Supreme Court has stated, "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. ... This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." <u>Bounds</u>, 430 U.S. at 824-25, <u>clarified on other grounds</u>, <u>Lewis</u>, 518 U.S. 343.

Here, plaintiff alleges that PCJ does not provide current immigration law materials in their law libraries or access to forms and statutes online. He does not allege that he has suffered an actual injury from the alleged inadequacy of the law library. It is further noted that plaintiff is not precluded from filing lawsuits as this action is demonstrative of his ability to access the courts. Thus, without allegations of an actual injury, this claim will be dismissed without prejudice.

D.  <u>Conditions of Confinement</u>

As noted above with respect to medical care, pretrial detainees retain <u>at</u> <u>least</u> those constitutional rights enjoyed by convicted prisoners. This applies as well to claims regarding

23

jail conditions.  <u>Bell v. Wolfish</u>, 441 U.S. at 545; <u>Hubbard</u>, 399 F.3d at 165-66; <u>Natale v. Camden County Correctional Facility</u>, 318 F.3d 575, 581-82 (3d Cir. 2003); <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 187-88 (3d Cir. 1993).  Analysis of whether a pre-trial detainee has been deprived of liberty without due process is governed by the standards set out by the Supreme Court in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).  <u>Fuentes</u>, 206 F.3d at 341-42.  <u>See also</u> this Opinion at pages 19-21.

A conditions of confinement claim is a constitutional attack on the general conditions, practices, and restrictions of pretrial or other detainee confinement.  <u>See Scott v. Moore</u>, 114 F.3d 51, 53 (5th Cir. 1997).  A constitutional violation exists if the court finds that the conditions of confinement are not reasonably related to a legitimate, non-punitive governmental objective.  <u>See Bell v. Wolfish</u>, 441 U.S. at 538-39.

Here, at this stage of the proceedings, it would appear that plaintiff's allegations are sufficient to state a claim for "punishment" in violation of the Fourteenth Amendment.  Plaintiff claims that he has been denied basic hygiene products and clothing that are mandated by the detention manual to be followed by detention facilities in contract with the BICE.  He also contends that the conditions of severe overcrowding, the failure to provide medically-necessary diets, sleeping and eating in close proximity to dirty toilets and urinals, vermin-infested

24

cells, and poor ventilation are unconstitutional conditions of confinement.  As the requirements of the Eighth Amendment set a "floor" for analysis of Fourteenth Amendment due process claims, it is worth noting that denial of the "minimal civilized measure of life's necessities", Rhodes v. Chapman, 452 U.S. 337, 347 (1981), which would include basic sanitary conditions that plaintiff alleges are lacking, would be sufficient to state an actionable constitutional deprivation.  Further, these unsafe, unsanitary and inadequate conditions do not appear reasonably related to a legitimate, non-punitive governmental objective. Therefore, this claim will be allowed to proceed as against all named defendants.[6]

E.   Unlawful Search of Cell

Plaintiff claims that the use of attack dogs to search detainees' cells, and the deliberate chaos caused by throwing mattresses and personal items on the floor, violates his constitutional rights.  He complains that such searches are conducted to intimidate and terrorize the detainees.  He does not allege that any detainee has been harmed by the dogs during these routine searches.

---

[6] The BICE officials contract with the jail facilities to house and care for immigration detainees pending their removal from the United States.  Plaintiff has alleged that these defendants have sufficient knowledge about the conditions in Passaic County Jail that conflict with the detention manual requirements to hold them liable for unconstitutional conditions of confinement.

Institutional security may necessitate the limitation of inmates' constitutional rights. Bell v. Wolfish, 441 U.S. at 545-46. For this reason, decisions by prison administrators regarding matters of security, discipline, and administration are accorded great deference. Id. at 547. Thus, when a prison regulation or practice impinges on an inmate's constitutional rights, that regulation or practice is valid if it is reasonably related to legitimate penological interests such as institutional security. Lewis v. Casey, 518 U.S. 343, 361-62 (1996); Washington v. Harper, 494 U.S. 210, 223-24 (1990)(citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

Here, the searches at issue are conducted in the cells and do not involve any physically invasive procedure. From the facts alleged by plaintiff, the searches were related to security concerns with respect to contraband and dangerous items that may be concealed by inmates (including detainees) in a confined institution. Thus, it appears that the jail has a legitimate security concern in conducting routine searches that clearly outweighs the individual safety concern by plaintiff, especially where the searches are not intrusive and have not caused any actual harm towards the detainees. This claim will be dismissed for failure to state a claim of a constitutional deprivation.[7]

---

[7] To the extent plaintiff may be alleging that he lost personal items, a claim for deprivation of property would also be dismissed. An inmate may be able to establish an

26

unconstitutional deprivation of property by showing confiscation
or loss of materials either in retaliation for the exercise of
constitutional rights or where, as a result, there was a denial
of access to the courts.  <u>See</u> <u>Hodgin v. Agents of Montgomery</u>
<u>County</u>, 619 F. Supp. 1550, 1553-54 (E.D. Pa. 1985).  Absent proof
of retaliation or denial of access, which have not been alleged
in this action, plaintiff must demonstrate that the loss of his
personal property amounted to a violation of procedural due
process.

The Due Process Clause prohibits a state or local government
entity from depriving a person of property without due process of
law.  <u>Greenholtz v. Inmates of Nebraska Penal and Correctional</u>
<u>Complex</u>, 442 U.S. 1, 7 (1979).  To analyze a due process claim, a
Court conducts a familiar two-part inquiry:  a Court determines
whether the plaintiff "was deprived of a protected interest, and,
if so, what process was his due."  <u>Logan v. Zimmerman Brush Co.</u>,
455 U.S. 422, 428 (1982); <u>see also</u> <u>Holman v. Hilton</u>, 712 F.2d
854, 858 (3d Cir. 1983).

Property loss caused by the intentional acts of government
officials does not give rise to a procedural due process claim
under § 1983 where a post-deprivation remedy satisfying minimum
procedural due process requirements is available under state law.
<u>See</u> <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on
other grounds by <u>Daniels v. Williams</u>, 474 U.S. 327 (1986)); <u>see</u>
<u>also</u> <u>Zinermon v. Burch</u>, 494 U.S. 113, 115 (1990); <u>Hudson v.</u>
<u>Palmer</u>, 468 U.S. 517 (1984); <u>Holman</u>, 712 F.2d at 856.  The New
Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 <u>et</u>
<u>seq.</u>, provides a post-deprivation judicial remedy to persons who
believe they were deprived of property at the hands of the State
or local government.  In this case, plaintiff's recourse after
his personal property was lost or confiscated would be a common-
law tort action against the defendant under the New Jersey Tort
Claims Act, N.J. STAT. ANN. §§ 59:1-1 <u>et</u> <u>seq</u>.  Plaintiff does not
indicate that he attempted to file a claim pursuant to the New
Jersey Tort Claims Act.

Accordingly, the Court finds that the NJTCA was available to
plaintiff as a matter of law as a remedy for his alleged property
loss at the hands of the defendants.  <u>See</u> <u>Holman</u>, 712 F.2d at
857; <u>Asquith v. Volunteers of America</u>, 1 F. Supp.2d 405, 419
(D.N.J. 1998), <u>aff'd</u> 186 F.3d 407 (3d Cir. 1999).  Because the
NJTCA provided all the process that was due for the alleged
property loss, plaintiff's loss of property claim should be
dismissed for failure to state a claim upon which relief may be
granted.

F.  Equal Protection Claim

     Next, plaintiff argues a general claim that he has been
denied his right to equal protection under the law, as guaranteed
by the Fifth and Fourteenth Amendments, as an immigration
detainee.

     The Equal Protection Clause of the Fourteenth Amendment
commands that no State shall "deny to any person within its
jurisdiction the equal protection of the laws," which is
essentially a direction that all persons similarly situated
should be treated alike.  City of Cleburne, Texas v. Cleburne
Living Center, 473 U.S. 432, 439 (1985) (citing Plyler v. Doe,
457 U.S. 202, 216 (1982); Artway v. Attorney General of New
Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996).  Despite its sweeping
language, though, "[t]he Equal Protection Clause does not forbid
classifications.  It simply keeps governmental decisionmakers
from treating differently persons who are in all relevant
respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

     Proof of disparate impact alone, however, is not sufficient
to succeed on an equal protection claim; a plaintiff also must
prove that the defendant intended to discriminate.  Village of
Arlington Heights v. Metropolitan Housing Development Corp., 429
U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242,
244-45 (1976).  Thus, discriminatory intent must be a motivating

28

factor in the decision, but it need not be the sole motivating factor. <u>Village of Arlington Heights</u>, 429 U.S. at 265-66.

Under this standard, the Court finds that plaintiff has failed to articulate an equal protection violation. Plaintiff has not alleged that he was singled out for discriminatory treatment different from other similarly situated prisoners. Moreover, inmates are not members of a suspect class, and plaintiff was not denied a fundamental right. <u>See</u> <u>Hodges v. Klein</u>, 562 F.2d 276 (3d Cir. 1977); <u>Myrie v. Comm'r, N.J. Dept. Of Corrections</u>, 267 F.3d 251, 263 (3d Cir. 2001)(noting that inmates, as a class, do not constitute a "discrete and insular" minority); <u>Abdul-Akbar v. McKelvie</u>, 239 F.3d 307 (3d Cir.), <u>cert</u>. <u>denied</u> 533 U.S. 953 (2001). Therefore, the Court concludes that plaintiff has failed to demonstrate any equal protection violation and his claim will be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim upon which relief may be granted.

G. <u>Failure to Train and Supervise</u>

Plaintiff also generally alleges that the named Defendants failed to train and supervise persons working in detention facilities, in particular, PCJ, as to the proper procedures and conditions for detaining immigration detainees consistent with the BICE manual. In general, where a plaintiff seeks to establish liability based on a supervisor's (or municipality's)

failure to train or supervise adequately, the plaintiff must show that a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train or supervise can fairly be said to represent official policy.  City of Canton v. Harris, 489 U.S. 378, 388-92 (1989); Stoneking v. Bradford Area School Dist., 882 F.2d 720, 724-26 (3d Cir. 1989), cert. denied, 493 U.S. 1044 (1990).

In resolving the issue of municipal or supervisory liability,

> the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program.  ...  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training ... .  Moreover, for liability to attach ... the identified deficiency in a city's training program must be closely related to the ultimate injury.

City of Canton, 489 U.S. at 390-91.

Here, plaintiff contends that the named supervisory officials at Passaic County Jail and at the BICE, bear responsibility for training and supervising the conditions and treatment of immigration detainees.  Because plaintiff's conditions of confinement claim is proceeding, plaintiff's allegations for failure to train and supervise with respect to

30

the egregious conditions in the jails, should be sufficient to avoid dismissal at this preliminary stage of the litigation.

## V.   CONCLUSION

For the reasons stated above, the Court will dismiss the Complaint in its entirety, for failure to state a claim, as against the defendants the United States Department of Homeland Security and the Bureau of Immigration and Customs Enforcement. As to the remaining defendants, the Court will dismiss without prejudice plaintiff's claims alleging denial of dental care, excessive force, and denial of access to the courts.  The claims alleging unlawful searches and denial of equal protection will be dismissed with prejudice for failure to state a claim.  However, the remaining claims alleging unconstitutional conditions of confinement and failure to train and supervise will be allowed to proceed.  An appropriate Order follows.

s/William J. Martini

_____
WILLIAM J. MARTINI
United States District Judge

DATED: June 24, 2005